## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FRATERNAL ORDER OF POLICE, MIAMI LODGE 20, INSURANCE TRUST FUND on behalf of itself and all others similarly situated, | ) ) ) ) | CASE NO. |
| *Plaintiff*, | ) ) | |
| v. | ) ) | CLASS ACTION COMPLAINT |
| AUROBINDO PHARMA USA, INC., CITRON PHARMA, LLC, HERITAGE PHARMACEUTICALS, INC., TEVA PHARMACEUTICALS USA, INC., JEFFREY A. GLAZER, and JASON T. MALEK, | ) ) ) ) ) ) | JURY TRIAL DEMANDED |
| *Defendants*. | ) ) | |

## INTRODUCTION

1.     Plaintiff Fraternal Order of Police, Miami Lodge 20, Insurance Trust Fund ("FOP Miami" or "Plaintiff"), on behalf of itself and all others similarly situated, brings this class action for claims under federal and state antitrust and consumer protection laws and the common law of unjust enrichment to recover damages and to obtain injunctive and equitable relief for the injuries it and others similarly situated have sustained against Aurobindo Pharma USA, Inc., Citron Pharma, LLC, Heritage Pharmaceuticals, Inc., Teva Pharmaceuticals USA, Inc., Jeffrey A. Glazer, and Jason T. Malek (collectively "Defendants") arising from their conspiracy to fix, raise, maintain and stabilize the prices of generic glyburide tablets ("Glyburide") in the United States during the period from April 1, 2014 through December 31, 2015 (the "Class Period"), in the states and districts identified below, and to allocate markets and customers for those products during the same time period.  All allegations herein are based on review of publicly available documents, counsel's investigation, Plaintiff's personal knowledge as to itself, and information and belief.

2.      Glyburide is an oral anti-diabetic medication prescribed to treat high blood sugar caused by Type 2 diabetes.

3.      Generic versions of Glyburide have been on the market since the mid-1990s, and until April 2014, the price of Glyburide was relatively stable.  This was a direct result of competition spurred by the presence of various generic drugs, which benefit consumers and third-party payors through lower prices.

4.      During the Class Period, however, Glyburide has seen unprecedented and astounding price increases.  Between April 1, 2014 and December 31, 2015, the price of Glyburide has soared to **200%** of its prior prices.

5.      These price increases did not stem from competitive behavior caused by, for instance, supply shortages or changed product demand.  Rather, they were the scion of Defendants' broad and wide-ranging conspiracy to fix, raise, maintain and stabilize the prices of these products, and to allocate customers and markets for them.  Defendants effectuated their conspiracy by direct business-to-business contacts among generic drug manufacturers, secret communications and meetings, and/or joint participation taken under the guise of trade associations like the Generic Pharmaceutical Association ("GPhA").

6.      Defendants' conspiracy has further benefited from oligopolistic market conditions, caused by the low number of competitors and barriers to entry in the Glyburide market. Such conditions have allowed Defendants to sustain anticompetitive behaviors such as their increased pricing during the Class Period.

7.      Recently, price increases for generic drugs have garnered scrutiny from federal and state governments alike. The Department of Justice ("DOJ") and the Connecticut Attorney General's Office ("CTAG") have both issued subpoenas to as many as a dozen generic drug

companies concerning prices of at least two dozen drugs. The DOJ's subpoenas arose from a grand jury proceeding in the Eastern District of Pennsylvania that is investigating whether Defendants and other drug manufacturers conspired to fix generic drug prices.

8.      DOJ's and CTAG's investigations began in the summer of 2014, with both of these agencies issuing subpoenas to Defendants concerning anticompetitive practices in the generic pharmaceutical industry.

9.      Congress has taken notice of the price increases as well.  Rep. Elijah Cummings, Ranking Member of the House Committee on Oversight and Government Reform, and Sen. Bernie Sanders, Chairman of the Subcommittee on Primary Health and Aging of the Senate Committee on Health, Education, Labor and Pensions, have each written letters to Defendants to request information concerning their sales of other generic drugs that have experienced similar increases. Such drugs include digoxin, doxycycline, albuterol sulfate, glycopyrrolate, divalproex sodium ER, neostigmine methylsulfate, and benazepril/hydrochlorothiazide.

10.      Defendants received a letter from Senator Bernie Sanders and Congressman Elijah E. Cummings in October 2014 requesting information concerning their pricing of generic drugs.[1]

11.      Rep. Cummings and Sen. Sanders launched their investigations on the basis of drug price information that they compiled after the increases were recorded.[2] This information shows the stunning rise in generic prices during the relevant time period:

12.      Most recently, on December 12, 2016 the DOJ filed criminal informations against Defendants Glazer and Malek, respectively the former Chief Executive Officer and President of

---

[1] These investigations concern generic drugs and Plaintiff reserves the right to amend its Complaint to add more parties and/or more claims as additional information is revealed.
[2] http://www.sanders.senate.gov/download/face-sheet-on-generic-drug-price-increases?inline=file.

Defendant Heritage Pharmaceutical, Inc.  These informations accused Malek and Glazer of conspiring to "knowingly enter[] into and engag[ing] in a combination and conspiracy with other persons and entities engaged in the production and sale of generic pharmaceutical products, including Glyburide and doxycycline hyclate, the primary purpose of which was to allocate customers, rig bids, and fix and maintain prices of Glyburide  and doxycycline hyclate sold in the United States."[3]

13.     Additionally, on December 14, 2016, the attorneys general ("AG") of twenty states filed a complaint against multiple generic manufacturers of Glyburide and doxycycline hyclate for conspiring to fix the prices and allocate the market for this medication.[4]

14.     Significantly, both the DOJ informations as well as the AG Complaint indicate that these actions by the generic manufacturers of Glyburide and doxycycline hyclate were not isolated and limited to those drugs.  The AG Complaint mentions a "wide-ranging series of conspiracies implicating numerous different drugs and competitors."[5]

15.     The   AG   Complaint   acknowledged   that   "[m]ost   of   the   conspiratorial communications were intentionally done in person or by cell phone, in an attempt to avoid creating a record of their illegal conduct. The generic drug industry, through the aforementioned opportunities to collude at trade shows, customer events and smaller more intimate dinners and meetings, allowed these communications to perpetuate. When communications were made in

---

[3] "Information," p. 2 (December 12, 2016) (ECF No. 1) in *United States v. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa.); "Information," p. 2 (December 12, 2016) (ECF No. 1) in *United States v. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa.).
[4] *State of Connecticut v. Aurobindo Pharma USA, Inc*., No. 3:16-cv-2056 VLB (D. Conn.).
[5] *Id*. at ¶9.

writing, or by text message, some of the Defendants even took overt and calculated steps to destroy evidence of those communications."[6]

16.     Defendants' conspiracy to fix, raise, maintain and stabilize the prices of Glyburide has caused, and continues to cause, consumers and third-party payors to pay supracompetitive prices for Glyburide.

17.     Plaintiff seeks to certify two classes. The first class (the "Injunctive Class") is a national injunctive class of persons or entities in the United States and its territories who indirectly purchased, paid and/or provided reimbursement for some or the entire purchase price of generic Glyburide products manufactured by Defendants during the Class Period.

18.     The second class (the "Damages Class") includes all persons or entities who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price of generic Glyburide products manufactured by Defendants during the Class Period in the states identified herein and the District of Columbia.

## JURISDICTION AND VENUE

19.     Plaintiff brings this action under Section 16 of the Clayton Act (15 U.S.C. § 26), for injunctive relief and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiff and the Class Members by reason of violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. § 1, 3).

20.     This action is also instituted under the antitrust, consumer protection, and common laws of various states for damages and equitable relief, as described in the Claims for Relief below.

21.     Pursuant to 28 U.S.C. §§ 1331 and 1337, Section 16 of the Clayton Act (15 U.S.C. §26), and 28 U.S.C. § 1367, jurisdiction is conferred upon this Court.

---

[6] *Id.* at ¶13.

22.     Pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C § 1391(b), (c) and (d), venue is proper in this judicial district because during the Class Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District. Therefore, it is likely that acts in furtherance of the alleged conspiracy took place here. Venue is also proper in this District because the federal grand jury investigating the pricing of generic drugs is empaneled here.

23.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) sold Glyburide throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) was engaged in an illegal scheme and price-fixing conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

## PARTIES

24.     Plaintiff FOP Miami is a governmental plan established and funded through contributions from the City of Miami and the plan's members, who are current and retired sworn officers from the City of Miami Police Department and their dependents. FOP Miami was established pursuant to a duly executed Trust Agreement for the purpose of providing medical, surgical and hospital care or benefits, including prescription drug benefits, to its members. FOP Miami maintains its principal place of business at 400 NW 2nd Avenue, Miami, Florida, and is a citizen of Florida.  During the Class Period, FOP Miami purchased and paid for some or all of the purchase price for one or more Glyburide prescriptions in Florida, and North Carolina, thereby suffering injury to its business and property.  FOP Miami paid and reimbursed more for these

products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers.

25.     Defendant Aurobindo Pharma USA, Inc. ("Aurobindo") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 6 Wheeling Road, Dayton, New Jersey.   Aurobindo has a partnership with Citron Pharma LLC in which Aurobindo manufactures Glyburide that Citron markets and sells under its trade dress. During the Class Period, Aurobindo conspired with Citron and others to fix and raise the prices of Glyburide sold in the United States.

26.     Defendant Citron Pharma, LLC. ("Citron") is a corporation organized and existing under the laws of the State of New Jersey with its principal place of business at 2 Tower Center Boulevard, Suite 1101, East Brunswick, New Jersey.  In December 2016, ACETO Corporation acquired the generic products and related assets from Citron for $429 million.  During the Class Period, Citron sold generic Glyburide to customers in this District and other locations in the United States.

27.     Defendant Heritage Pharmaceuticals, Inc. ("Heritage") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 12 Christopher Way, Suite 300 Eatontown, New Jersey.  During the Class Period, Heritage sold generic Glyburide to customers in this District and other locations in the United States.

28.     Defendant Teva Pharmaceuticals USA, Inc. ("Teva") is a Pennsylvania-based corporation with its principal place of business at 1090 Horsham Road, North Wales, Pennsylvania 19454.  Teva is a subsidiary of Teva Pharmaceuticals Industries Ltd., an Israeli company with its principal place of business at 5 Basel Street, Petach Tikva, Israel 49131.  Teva manufactures,

markets, and sells generic pharmaceutical products.  During the Class Period, Teva sold generic Glyburide to customers in this District and other locations in the United States.

29.     Defendant Jeffrey A. Glazer ("Glazer") is an individual residing in Marlboro, New Jersey.  Glazer is an attorney licensed by the New Jersey State Bar (Attorney ID# 031701998). Glazer was the Chief Executive Office and Chairman of Defendant Heritage.  During the Class Period, Glazer, in his capacity as CEO of Heritage, conspired with others to fix and raise the price of Glyburide sold in this District and other locations in the United States.

30.     Defendant Jason T. Malek ("Malek") is an individual residing in Ocean, New Jersey.  Malek was Senior Vice President, Commercial Operations, and later President, of Defendant Heritage.   During the Class Period, Malek, in his capacity of VP Commercial Operations of Heritage, conspired with others to fix and raise the price of Glyburide sold in this District and other locations in the United States.

31.     Whenever in this Complaint reference is made to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

32.     All acts alleged in this Complaint to have been done by Defendants Aurobindo, Citron, Heritage, and Teva were performed by their officers, directors, agents, employees or representatives while engaged in the management, direction, control or transaction of Defendants' business affairs.

## CO-CONSPIRATORS

33.    Various other persons, firms, corporations and entities have participated as unnamed co-conspirators with Defendants in the violations and conspiracy alleged herein. In order to engage in the offenses charged and violations alleged herein, these co-conspirators have performed acts and made statements in furtherance of the antitrust violations and conspiracies alleged herein.

34.    At all relevant times, each Defendant was an agent of each of the remaining Defendants, and in doing the acts alleged herein, was acting within the course and scope of such agency. Each Defendant ratified and/or authorized the wrongful acts of each of the Defendants. Defendants, and each of them, are individually sued as participants and as aiders and abettors in the improper acts and transactions that are the subject of this action.

## INTERSTATE AND INTRASTATE TRADE AND COMMERCE

35.    The business activities of Defendants that are the subject of this action were within the flow of, and substantially affected, interstate trade and commerce.

36.    During the Class Period, Defendants sold substantial quantities of generic Glyburide in a continuous and uninterrupted flow of interstate commerce to customers throughout the United States.

37.    Defendants' anticompetitive conduct has substantial intrastate effects in that, *inter alia*, generic Glyburide has been and is offered at higher prices to end-payors inside each respective state than they would have been or would be but for Defendants' conduct. The complete lack of availability of competitive priced generic Glyburide directly impacts and disrupts commerce for end-payors within each state.

38.     Defendants' conduct has had, and continues to have, a direct, substantial and reasonably foreseeable effect on both interstate commerce and on intrastate commerce in each Class state, including commerce in this District and state, and it will continue to do so if not constrained by the Court.

## FACTUAL ALLEGATIONS

### Generic Drugs and the Pharmaceutical Industry

39.     Defendants manufacture and sell, *inter alia*, generic versions of branded drugs once any applicable patent on the branded drugs expires.

40.     Generic drugs are "the same as a brand name drug in dosage, safety, strength, how it is taken, quality, performance, and intended use."[7]  If the FDA approves a generic drug as "therapeutically equivalent" to a brand drug, the generic version "can be expected to have equal effect and no difference when substituted for the brand name product."[8] Generics in mature markets often cost as little as 10-15% of the branded drug's price.[9]

41.     Studies have shown that generic drugs' entrance onto the market can quickly erode a branded drug's market share – often 90% of the branded drug's sales. Per IMS Health data, generic drugs as of 2013 account for 86% of all drugs dispensed in the United States.[10]

---

[7] http://www.fda.gov/Drugs/InformationOnDrugs/ucm079436.htm#G.

[8] *Id.*

[9] FTC Staff Study, PAY-FOR-DELAY: HOW DRUG COMPANY PAY-OFFS COST CONSUMERS BILLIONS, at 8 (Jan. 2010), *available at* http://emmanuelcombe.org/delay.pdf.

[10] IMS Institute for Healthcare Informatics, Medicine use and shifting costs of healthcare: A review of the use of medicines in the United States in 2013 (Apr. 2014), at 51, http://www.plannedparenthoodadvocate.org/2014/IIHI_US_Use_of_Meds_for_2013.pdf.



42.     The more generic versions of a drug available on the market, the lower the prices that consumers and third-party payors have to pay. Each successive generic product in a competitive market lowers the price because each entry increases competition for sales and market share.  In a competitive market, both the branded manufacturer and the older generic manufacturers lower prices in response to the new competitor, as the following FDA chart shows[11]:

---

[11] FDA, Generic Competition and Drug Prices,
http://www.fda.gov/AboutFDA/CentersOffices/OfficeofMedicalProductsandTobacco/CDER/uc
m129385.htm.



**Generic Competition and Drug Prices**

Source: FDA analysis of retail sales data from IMS Health, IMS National Sales
Perspective (TM), 1999-2004, extracted February 2005

43.     Accordingly, generic competition to a branded drug can provide billions of dollars in savings to consumers, pharmacies, other purchasers, private health insurers, health and welfare funds and state Medicaid programs, which reimburse drug purchases for their insureds. A GPhA study found that generic drugs saved the U.S. healthcare system $1.68 trillion between 2005 and 2014, including $254 billion in 2014 alone.[12]

44.     The great benefits of generic competition were recognized by Congress and memorialized with the enactment of the Drug Price and Patent Term Restoration Act of 1984, (the "Hatch-Waxman Act").  The Hatch-Waxman Act simplifies and sets out the regulatory hurdles with which generic drug manufacturers have to comply prior to marketing and selling generic drugs.  For example, rather than having to file a lengthy New Drug Application ("NDA"), the Hatch-Waxman Act provides for a generic drug manufacturer to file an Abbreviated New Drug Application ("ANDA") in order to obtain FDA approval.

---

[12] Generic Pharmaceutical Association, *Generic Drug Savings in the U.S.*, at 1 (2015), http://www.GPhAonline.org/media/wysiwyg/PDF/GPhA_Savings_Report_2015.pdf.

45.     An ANDA applicant must show that its generic drug is bioequivalent to the brand drug, and the ANDA applicant can rely on the scientific and clinical data compiled by the Brand's NDA, including safety and efficacy data.  This reliance allows the generic company to forego duplicative and expensive experimentation and having to perform its own clinical trials.

46.     During the approval process, the FDA will assign a "Therapeutic Equivalence Code" ranging from "AA" to "BX."  An "AB" rating signifies that the approved generic drug is therapeutically equivalent to its branded counterpart.

47.     Due to the price differentials between branded and generic drugs, as well as other institutional features of the pharmaceutical industry, pharmacists liberally (and sometimes are legally required to) substitute a generic drug when consumers fill prescriptions for a branded drug. Since passage of the Hatch-Waxman Act, every state has adopted substitution laws requiring or permitting pharmacies to substitute generic drug equivalents (AB rated) for branded drug prescriptions (unless the prescribing physician specifically orders otherwise by writing "dispense as written" or similar language on the prescription).

**Market for Generic Glyburide**

48.     The market for generic Glyburide is mature.  Defendants must compete on price in order to gain market share.

49.     Glyburide is a widely prescribed anti-diabetic drug of the sulfonylurea class used "to control high blood sugar in people with type 2 diabetes."[13]  Left untreated high blood sugar can lead to kidney damage, blindness, nerve problems, loss of limbs, and sexual function problems.[14]

---

[13] http://www.webmd.com/drugs/2/drug-3917/glyburide-oral/details
[14] *Id.*

50.     Branded versions of Glyburide have been on the market for over 30 years.  Generic versions have been available since the mid-1990s.

51.     Collectively, Defendants sell hundreds of millions of dollars of generic Glyburide each year.

### Pricing of Glyburide Inexplicably Rises

52.     In 2012, the Centers for Medicare and Medicaid Services commissioned a company called Myers and Stauffer to take surveys of pharmacies across the U.S. to determine the average price of prescription drugs.  The National Average Drug Acquisition Cost ("NADAC") is a master list which is updated and published weekly.  This list calculates the cost per pill that drug manufacturers charge for their medications and is based on the average actual acquisition costs for retail pharmacies across the United States.

53.     Without changes in the market or supply shortages, competition in the market for generic Glyburide should have remained at pre-Class Period levels.  This sudden unexplained and sustained price increase can be reasonably inferred to be caused by anticompetitive behavior by the generic manufacturers, *i.e.*, illegal collusion among the generic manufacturers to fix, raise, maintain or stabilize the price of generic Glyburide.

54.     Defendants' pricing conduct smacks of collusion, as multiple competitors at multiple times for multiple products have engaged in mirror-image price increases to untenable and anticompetitive levels, to the great detriment of the purchasing public.

55.     In a competitive market price may raise when supply decreases, but in this case the FDA has reported no Glyburide shortages.  Defendants have failed to provide any explanation for the price increases.

14

**Government Investigations**

56.     During approximately this same period of time that Glyburide prices increased, prices for a number of other generic drugs also increased dramatically.  For example, the price of a generic antibiotic, doxycycline rose 8,281% between October 2013 and April 2014.[15]

57.     Due to the huge increase in this and other generic prices, Congress and state governments each began inquiries into numerous generic drug manufacturers' actions. The pricing data and other evidence resulted from these investigations.

58.     The inquiries requested the companies to provide documents and information from 2012 to the present, including total gross revenues from the sales of the drugs in question; the date, quantities, purchasers and prices paid for all sales of the drugs; total expenses relating to the sales of the drugs, as well as the specific amounts for manufacturing, marketing and advertising, and purchases of active pharmaceutical ingredients ("API"), if applicable; sales contracts or purchase agreements for API for the drugs, including any agreements relating to exclusivity, if applicable; a description and valuation of the specific financial and non-financial factors that contributed to the various companies' decisions to increase the prices of the drugs; any cost estimates, project projections, or other analyses relating to the companies' current and future sales of the drugs; prices of the drugs in all foreign countries or markets, including price information for the countries paying the highest and lowest prices; and the identity of official(s) responsible at each company for setting the prices of these drugs over the above time period.[16]

59.     Congressman Sanders and Cummings held a hearing in November 2014 to discuss the drugs that had recently spiked in price, putting a drain on consumers' budgets.

---

[15] http://www.sanders.senate.gov/newsroom/press-releases/congress-investigating-why-generic-drug-prices-are-skyrocketing.
[16] *Id*. at 3.

60.     After Sen. Sanders' held a Senate hearing, on February 24, 2015, Rep. Cummings and Sen. Sanders wrote to the U.S. Department of Health & Human Services' Office of the Inspector General ("OIG"). They asked OIG to investigate how Defendants' price increases affected spending in the Medicare and Medicaid programming.[17]   OIG accordingly began to review quarterly average manufacturer prices for the top 200 generic drugs from 2005 to 2014.[18]

61.     On the state level, Connecticut attorney general George Jepsen issued subpoenas to numerous generic manufacturers in July 2014, on the basis that there was reason to believe that generic manufacturers engaged in a conspiracy which "has the effect of, (a) fixing, controlling or maintaining prices, rates, quotations, or fees; or (b) allocating or dividing customers or territories...."[19]  Jepsen has noted, "The issues we're investigating go way beyond two drugs and six companies.  Way beyond... We're learning new things every day."[20]

62.     The DOJ also launched a probe into alleged price-fixing among generic manufacturers. In November 2014, the DOJ issued grand jury subpoenas to many generic manufacturers requesting documents, information, and testimony relating to "communication or correspondence with any competitor in the sale of generic prescription medications." Impax Laboratories, Inc. was the first to disclose having received a subpoena.[21]  Additional subpoenas were issued in May 2016, and there may be additional ones issued.

---

[17] http://www.sanders.senate.gov/download/sanders-cummings-letter?inline=file.
[18] http://www.sanders.senate.gov/download/oig-letter-to-sen-sanders-4-13-2015?inline=file.
[19] Impax Laboratories (IPXL) Receives Subpoena from Connecticut AG, http://www.streetinsider.com/Corporate+News/Impax+Laboratories+(IPXL)+Receives+Subpoena+from+Connecticut+AG/9662945.html.
[20] Liz Szabo, et al., How Martinis, Steaks, and a Golf Round Raised Your Prescription Drug Prices, The Daily Beast (Dec. 21, 2016), http://thebea.st/2haV9xg
[21] Impax Laboratories, Inc. Current Report (Form 8-K) (November 3, 2014).

63. To date, numerous generic drug companies have been contacted in connection with both federal and state antitrust probes into pricing practices in the generic pharmaceuticals market, including: Taro, Sandoz, Actavis, Citron, Teva, Lannett, Impax, Par, Mylan, Sun, Dr. Reddy's, Mayne, and Zydus.

**Defendants Conspired to Fix Glyburide Prices**

64. Defendants have participated in a multiyear conspiracy designed to fix and raise the prices of Glyburide, rig bids for Glyburide, and allocate Glyburide customers. The conspiracy was run by Defendants Malek and Glazer through Heritage. Malek and Glazer organized and monitored the conspiracy.

65. During a conference call with Heritage employees on April 22, 2014, Malek discussed drugs targeted for price increases, including Glyburide, and highlighted the need to coordinate pricing with Defendants Aurobindo and Teva, who were the only Glyburide competitors at that time.

66. After the call, Malek directed Heritage sales team members to contact their counterparts at Aurobindo and Teva in order to reach agreement on Glyburide, and other drugs, price increases.

67. Malek communicated with Teva, which competed with Heritage for Glyburide, and other drugs, sales in several markets. Malek and Teva agreed to raise prices on Glyburide, and other drugs.

68. Defendants Malek and Glazer directed Heritage employees to coordinate and obtain agreements to raise prices for Glyburide, and other drugs. These efforts were memorialized in several emails Malek and Glazer sent imploring Heritage employees to reach agreements with

competitors as soon as possible. An April 28, 2014 email, for example, from Malek to one Heritage employee concerned the status of discussions with Aurobindo.

69.     On April 29, 2014, Glazer sent an email to the same Heritage employee requesting further information.  Malek sent a follow-up email on April 30th requesting an update.

70.     On May 9, 2014, Heritage held a teleconference with its employees to discuss Glyburide and other drug price increases.

71.     One week later, a Heritage employee met in-person with several competitors while attending the Minnesota Multistate Contracting Alliance for Pharmacy ("MMCAP").  The Heritage employee and her counterpart at Aurobindo agreed that both companies would raise the price of Glyburide.  On May 15, 2014 that employee emailed Malek confirming this.

72.     On June 23, 2014, Heritage employees met to discuss the percentage amount of price increases they would seek for certain generic drugs, including Glyburide, and the strategy for implementing those price increases.  The consensus reached was to increase Glyburide prices by 200%.

73.     Heritage employees continued contacting Glyburide and other drug competitors over the following weeks to secure agreements to raise prices for Glyburide and other drugs.

74.     When Citron appeared to be gearing up to enter the Glyburide market, through its partnership with Aurobindo, a Heritage employee contacted her friend at Citron to discuss its Glyburide pricing and bidding strategies.

75.     Malek continued to direct Heritage's employees to communicate with Glyburide competitors in order to reach new agreements and to maintain the existing ones on pricing and bidding.

76.    On December 12, 2016, the DOJ filed criminal informations against Defendants Glazer and Malek.  These informations accused Malek and Glazer of conspiring to "knowingly enter[] into and engag[ing] in a combination and conspiracy other persons and entities engaged in the production and sale of generic pharmaceutical products, including doxycycline hyclate and Glyburide, the primary purpose of which was to allocate customers, rig bids, and fix and maintain prices of doxycycline hyclate and Glyburide sold in the United States."[22]

77.    A press release issued by DOJ in conjunction with these filings stated:

> Millions of Americans rely on prescription medications to treat acute and chronic health conditions.  By entering into unlawful agreements to fix prices and allocate customers, these two executives sought to enrich themselves at the expense of sick and vulnerable individuals who rely upon access to generic pharmaceuticals as a more affordable alternative to brand-name medicines," said Deputy Assistant Attorney General Brent Snyder of the Justice Department's Antitrust Division.  "These charges are an important step in correcting that injustice and in ensuring that generic pharmaceutical companies compete vigorously to provide these essential products at a price set by the market, not by collusion.

> Conspiring to fix prices on widely-used generic medications skews the market, flouts common decency – and very clearly breaks the law," said Special Agent in Charge Michael Harpster of the FBI's Philadelphia Division.  "It's a sad state of affairs when these pharmaceutical executives are determined to further pad their profits on the backs of people whose health depends on the company's drugs.  The FBI stands ready to investigate and hold accountable those who willfully violate federal antitrust law.

> Today's charges are the result of an ongoing federal antitrust investigation into price fixing, bid rigging and other anticompetitive conduct in the generic pharmaceutical industry, which is being conducted by the Antitrust Division's Washington Criminal I Section with the assistance of the FBI's Philadelphia Division, the FBI headquarters' International Corruption Unit, the United States

---

[22] "Information," p. 2 (December 12, 2016) (ECF No. 1) in *United States v. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa.); "Information," p. 2 (December 12, 2016) (ECF No. 1) in *United States v. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa.).

Postal Service Office of Inspector General and the U.S. Attorney's
Office for the Eastern District of Pennsylvania.[23]

78.     On December 14, 2016, the attorneys general ("AG") of twenty states filed a
complaint against multiple generic manufacturers of doxycycline hyclate and Glyburide for
conspiring to fix the prices and allocate the market for this medication.[24]

79.     Significantly, both the DOJ press release, as well as the AG Complaint, indicates
that these actions by the generic manufacturers of doxycycline hyclate and Glyburide were not
isolated and limited to these two drugs.  The AG Complaint mentions a "wide-ranging series of
conspiracies implicating numerous different drugs and competitors."[25]

80.     On or about January 10, 2017, Defendants Glazer and Malek plead guilty in federal
court in Philadelphia before U.S. District Judge R. Barclay Surrick and admitted to conspiring to
manipulate prices of a popular antibiotic (Doxycycline) and a diabetes medication (Glyburide)
between April 2013 and December 2015.[26]

## Collusion in the Generic Drug Market

81.     The United States generic Glyburide market displays various qualities that place it
at risk of collusion and other anticompetitive behavior.  Such qualities include: (1) high
concentration; (2) high barriers to entry; (3) inelasticity of demand; (4) lack of available product
substitutes; and (5) opportunities to conspire.

---

[23]   https://www.justice.gov/opa/pr/former-top-generic-pharmaceutical-executives-charged-price-fixing-bid-rigging-and-customer.
[24]   *State of Connecticut v. Aurobindo Pharma USA, Inc*., No. 3:16-cv-2056 VLB (D. Conn.)
[25]   *Id*. at ¶9.
[26]   http://www.philly.com/philly/news/410194135.html.

**Concentration in the Market.**

82.    Concentration in a market for goods creates susceptibility for collusion and other anticompetitive conduct. The market for Glyburide is highly concentrated. Defendants each possess large market shares in their respective markets. Only a handful of competitors exist in this market.

83.    During the Class Period the primary competitors for Glyburide were Defendants Aurobindo, Citron, Heritage, and Teva.

**High Barriers to Entry.**

84.    Typically, markets for goods that have high prices attract new competitors who can undercut competition by offering lower prices to the consuming public, thus mitigating effects of collusion. However, when a market has high barriers to entry, new competitors are less likely to enter the market. Accordingly, high barriers to entry facilitate collusive behavior.

85.    The market for generic Glyburide has high barriers to entry, including regulatory, intellectual property, and financial hurdles.

86.    All generic drug manufacturers must receive FDA approval prior to marketing and selling products. FDA approval requires, *inter alia*, the preparation and filing of an ANDA, which typically costs at least $1 million.[27]

87.    Further, both state and federal law govern the operation of drug manufacturing facilities. Such costs of doing business are another regulatory barrier to entry for potential competitors.

---

[27] Testimony of Dr. Scott Gottlieb, Hearing on "Why Are Some Generic Drugs Skyrocketing in Price?" (Nov. 20, 2014), available at https://www.aei.org/wp-content/uploads/2014/11/Gottlieb-Generic-Drug-Testimony-112014.pdf, at 7.

88.    Intellectual property costs can include acquisition of, and litigation over, patent rights, either through the investigation of whether a drug compound is protected by a valid patent or for establishment of preferred generic treatment under the Hatch-Waxman Act.  Transactional costs such as licensing deals can add further layers of costs.

89.    Finally, generic drug makers also incur large research and development costs, high labor costs to retain employees with specialized skills and knowledge as well as professional certifications suitable for the work required, significant capital outlay for sufficient real estate and equipment, and other corporate financial requirements inherent to the pharmaceutical industry.

90.    The small number of competitors in the generic Glyburide market reflects these high barriers to entry.

**Inelastic Demand.**

91.    In economics, elasticity of demand is the sensitivity of supply and demand to changes in one or the other.  Price elasticity is defined as the measure of how much the quantity demanded will change if price, a separate factor, changes. When price elasticity of demand is inelastic, prices increase because there will only be a small decrease in demand relative to the price increase, such that the increases make up for the decreases. Accordingly, total revenues rise in a market with price inelasticity of demand, even if raw sales figures go down.

92.    Perfectly inelastic demand occurs when consumers would pay anything for a good, such as food or water, which is necessary for survival.  Colluding entities can profit handsomely from goods that have nearly perfectly inelastic demand because they can charge whatever they wish knowing, first, that consumers will pay whatever price is charged, and second, that the collusion blocks any kind of competition that should serve to lower prices in that market.

93.     Accordingly, Defendants have been able to reap materially significant profits as a result of attacking the integrity of the market for generic Glyburide, as the market for the drug displays a price inelasticity of demand.

**Opportunities to Conspire.**

94.     Defendants' collusive scheme works because each Defendant has constant and continuous opportunities to meet rather than to compete. All Defendants participate in some capacity in GPhA, a leading trade association for generic drug manufacturers and distributors.  The below chart further outlines Defendants participation in GPhA events:

| Meeting | Meeting Date and Location | Attendees |
|---------|---------------------------|-----------|
| 2014 GPhA Annual Meeting | February 19-21, 2014, Orlando, Florida | Aurobindo, Heritage, Teva |
| 2014 GPha CMC Workshop | June 3-4, 2014 Bethesda, Maryland | Heritage, Teva |
| 2014 GPhA Fall Technical Conference | October 27-29, 2014 Bethesda, Maryland | Aurobindo, Citron, Heritage, Teva |
| 2015 GPhA Annual Meeting | February 9-11, 2015, Miami, Florida | Aurobindo, Heritage, Teva |
| 2015 GPhA CMC Workshop | June 9-10, 2015, Bethesda, Maryland | Citron, Heritage, Teva |
| 2015 GPhA Fall Technical Conference | November 2-4, 2015, Bethesda, Maryland | Aurobindo, Citron, Heritage, Teva |

95.     Additionally, as uncovered by the state attorneys' general investigation, Defendants attend industry trade shows and conferences which provide Defendants' representatives the opportunity to interact with each other directly, and discuss their respective businesses and customers.  Recreational and social events at these conferences, such as golf outings, lunches, cocktail parties, dinners, and other activities at these trade shows and conferences provide additional opportunities for conspirators to meet with competitors away from the usual business setting.  Defendants' representatives use these functions to discuss and share upcoming bids,

specific generic drug markets, pricing strategies and pricing terms in their contracts with customers, among other competitively-sensitive information.

96.      NACDS is a national trade association that represents chain pharmacies.  In addition to pharmacies, drug manufacturers and wholesalers are also members.  NACDS holds meetings and events that are attended by Defendants and other generic manufacturers.

97.      ECRM is a trade association that includes members from the medical and pharmaceutical industry.  ECRM holds events that Defendants and other generic manufacturers attend.

98.      HDMA is a national trade association that represents pharmaceutical distributor, linking the nation's top drug manufacturers with hundreds of thousands of pharmacies, hospitals, clinics, and long-term care facilities across the country.  Defendants Citron, Heritage, and Teva, as well as certain of their employees, are members of HDMA.

99.      Moreover, the DOJ's grand jury subpoenas and informations, as outlined in greater detail above, also indicate that communication between Defendants was prevalent. The DOJ has stated that "prosecutors are taking a close look at trade associations as part of their investigation as having been one potential avenue for facilitating the collusion between salespeople at different generic producers."[28]

100.     In addition to trade association meetings, Defendants attended customer conferences.  For example, the MMCAP holds multi-day conferences throughout the year.  Many generic manufacturers attend these conferences.  The week following Heritage's May 9, 2014, teleconference to discuss contemplated price increases for Glyburide, a number of Glyburide

---

[28] http://www.mergermarket.com/pdf/DoJ-Collusion-Generic-Drug-Prices-2015.pdf.

competitors met in person to discuss price increase strategy during an MMCAP conference. During that meeting, Heritage and Aurobindo confirmed their agreement to raise prices.

101.    Defendants took active steps to conceal their wrongdoing.  Heritage executives, going back to at least 2012, destroyed evidence in an effort to hide their wrongdoing.  For example, none of the Heritage email accounts had any company-imposed document retention policies associated with them.  In fact, Heritage executives reminded each other to delete emails that reflected incriminating behavior.

102.    Shortly after a text message exchange between Citron and Heritage employees, in which the companies agreed to fix and raise Glyburide prices, the Citron employee told her counterpart at Heritage not to communicate through Citron email, but to instead contact a designated Citron employee if they had information to share.

## ANTITRUST EFFECTS AND VIOLATIONS

103.    During the Class Period, Plaintiff and Damages Class Members purchased substantial amounts of Glyburide indirectly from Defendants.  Because of Defendants' illegal conduct set forth herein, the End-Payor purchasers have paid, and are still paying, artificially and substantially inflated prices for Glyburide.

104.    Plaintiff and Damages Class Members have sustained substantial losses and resultant damage to their business and property in the form of overcharges. These losses and damages will continue to accrue until the anticompetitive conduct set forth herein ceases. The full amount of such damages will be determined at trial.

105.    These losses are caused directly by Defendants' anticompetitive conduct, which had at least the following effects:

a.    Price competition in the market for generic Glyburide has been artificially restrained, suppressed or eliminated in the United States;

b.    Prices for generic Glyburide sold by Defendants have been raised, fixed, maintained, or stabilized at artificially high and supracompetitive levels; and

c.    Purchasers of generic Glyburide from Defendants have been deprived of the benefit of free and open competition in the market for generic Glyburide.

106.    At all relevant times, Defendants sold Glyburide within the continuous and uninterrupted flow of interstate commerce. Defendants transmitted invoices, contracts, funds and other forms of business communication throughout this time.

107.    The pricing and regulation in the generic drugs industry means that overcharges at higher levels of the distribution chain get passed down to end-payors such as Plaintiff and Damages Class Members. Wholesalers and retailers who incurred higher charges for Glyburide due to Defendants' behavior simply passed on those charges to the indirect purchasers.

108.    During the Class Period, Defendants engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain or stabilize the prices of generic drugs in the United States.

109.    In forming, effectuating and operating the contract, combination or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to artificially raise, fix, maintain, and/or stabilize the price of generic Glyburide sold in the United States. These activities include the following:

a.    Defendants met in person or telephonically to discuss the price of generic Glyburide in the United States;

b.    Defendants agreed during those meetings and conversations to charge set prices and otherwise to increase or maintain prices of generic Glyburide sold in the United States;

c.    Defendants agreed during those meetings and conversations to fix the price of generic Glyburide;

d.    Defendants issued price announcements in accordance with their agreements; and

e.    Defendants actually set prices in accordance with their agreements.

110.   Defendants' anticompetitive behavior allowed them to charge the purchasing public prices higher than what they would have been able to charge otherwise.

111.   Inflated prices for consumers purchasing Glyburide were a direct, traceable and foreseeable result of Defendants' conspiracy.

112.   Plaintiff and Damages Class Members purchased generic Glyburide from Defendants or their affiliates or co-conspirators at inflated, supracompetitive prices during the period of the conspiracy.

113.   Defendants' contract, combination or conspiracy constitutes an unreasonable restraint of interstate trade and commerce in violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3, and the laws of various states.

114.   But for Defendants' anticompetitive conduct, Plaintiff and Damages Class Members would not have paid these inflated prices. Accordingly, Plaintiff and Damages Class Members have been injured in their business and property in that they paid more for generic Glyburide than they would have paid in a competitive market.

## CLASS ALLEGATIONS

115.    Plaintiff brings this action on behalf of itself and as a class action under Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All persons and entities in the United States and its territories who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price for Defendants' generic Glyburide products during the Class Period, which runs from April 1, 2014, through December 31, 2016 or the date on which the anticompetitive effects subside.
>
> This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities except for cities, towns, or municipalities with self-funded prescription drug plans; (c) all persons or entities who purchased Defendants' generic Glyburide products for purposes of resale or directly from Defendants; (d) fully insured health plans (*i.e.*, health plans that purchased insurance covering 100% of their reimbursement obligation to members); (e) any "flat co-pay" consumers whose purchases of Defendants' generic Glyburide products were paid in part by a third party payor and whose co-payment was the same regardless of the retail purchase price; (f) pharmacy benefit managers and (g) any judges or justices involved in this action and any members of their immediate families.

116.    Plaintiff also brings this action on behalf of itself and as a class action under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, seeking damages pursuant to the common law of unjust enrichment and the state antitrust, unfair competition and consumer protection laws of the states listed below (the "Indirect Purchaser States")[29] on behalf of the following class (the "Damages Class"):

---

[29] The "Indirect Purchaser States" are Alabama, Arizona, California, District of Columbia, Florida, Hawaii, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Missouri, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia and Wisconsin.

All persons and entities in the Indirect Purchaser States who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price for Defendants' generic Glyburide products during the Class Period, which runs from April 1, 2014, through December 31, 2016 or the date on which the anticompetitive effects subside.

This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities except for cities, towns, or municipalities with self-funded prescription drug plans; (c) all persons or entities who purchased Defendants' generic Glyburide products for purposes of resale or directly from Defendants; (d) fully insured health plans (i.e., health plans that purchased insurance covering 100% of their reimbursement obligation to members); (e) any "flat co-pay" consumers whose purchases of Defendants' generic Glyburide products were paid in part by a third party payor and whose co-payment was the same regardless of the retail purchase price; (f) pharmacy benefit managers; and (g) any judges or justices involved in this action and any members of their immediate families.

117.    The Nationwide Class and the Damages Class are herein referred to as the "Classes." Members of each Class may be referred to as "Class Members."

118.    The Classes are each individually sufficiently numerous. Plaintiff believes there are hundreds of thousands, if not millions, of members in each Class, in an amount to be determined in discovery and at trial. The identities of Class Members will be readily ascertainable through business records kept in regular order.

119.    Common questions of law and fact exist as to all Class Members. The effects of Defendants' conspiracy were generally applicable to all Class Members, thereby making relief appropriate with respect to the Classes as a whole. Such questions of law and fact common to the Classes include but are not limited to:

      a.    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize prices of generic Glyburide;

      b.    Whether Defendants and their co-conspirators allocated markets for

customers for generic Glyburide sold in the United States;

c.      Whether Defendants' conduct harmed competition in the market for generic Glyburide;

d.      Whether Defendants' conduct has substantially affected interstate and intrastate commerce;

e.      Whether, and to what extent, Defendants' conduct caused and/or is causing antitrust injury to the business or property of Plaintiff and Damages Class Members in the nature of overcharges;

f.      The quantum of overcharges paid by Plaintiff and Damages Class Members;

g.      The participants in the alleged conspiracy;

h.      The duration of the alleged conspiracy;

i.      The acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

j.      Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Claim for Relief;

k.      Whether the alleged conspiracy violated state antitrust and unfair competition laws, and/or state consumer protection laws, as alleged in the Second Claim for Relief;

l.      Whether the Defendants unjustly enriched themselves to the detriment of the Plaintiff and the Class Members, thereby entitling Plaintiff and the Class Members to disgorgement of all benefits derived by Defendants, as alleged in the Third Claim for Relief;

m.      Whether the conduct of the Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the Class Members;

n.      The effect of the alleged conspiracy on the prices of generic Glyburide sold in the United States during the Class Period;

o.      The appropriate injunctive and related equitable relief for the Nationwide Class; and

p.      The appropriate class-wide measure of damages for the Damages Class.

120.    Plaintiff's claims are typical of the claims of the Class Members. Plaintiff will fairly

and adequately protect the interests of the Classes. Plaintiff and all Class Members are all affected

by Defendants' wrongful conduct in the same way, in that they paid artificially inflated prices for generic Glyburide purchased indirectly from the Defendants and/or their co-conspirators.

121.    Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other Class Members. Plaintiff's interests coincide with, and are not antagonistic to, those of the other Class Members. Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

122.    The questions of law and fact common to Class Members predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

123.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons or entities located throughout the United States to prosecute common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would require. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining relief for claims that could not practicably be pursued individually, substantially outweigh any difficulties that may arise in management of this class action.

124.    The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

### FIRST CLAIM FOR RELIEF
**Violation of Sections 1 and 3 of the Sherman Act**
**(on behalf of Plaintiff and the Nationwide Class)**

125.    Plaintiff repeats the allegations set forth above as if fully set forth herein.

126.    Defendants and unnamed conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade, in violation of Section 1 and Section 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

127.    The acts done by each Defendant as part of, and in furtherance of, their contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

128.    During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to establish a price floor and artificially fix, raise, stabilize, and control prices for generic Glyburide, thereby creating anticompetitive effects in the markets therefor.

129.    Defendants' acts and combinations in furtherance of the conspiracy have caused unreasonable restraints in the market for generic Glyburide.

130.    As a result of Defendants' unlawful conduct, Plaintiff and other similarly situated indirect purchasers in the Nationwide Class who purchased generic Glyburide have been harmed by being forced to pay inflated, supracompetitive prices for generic Glyburide.

131.    In formulating and carrying out the alleged agreement, understanding, contract, combination and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth herein.

132.    Defendants' conspiracy had the following effects, among others:

    a.    Price competition in the market for generic Glyburide has been artificially restrained, suppressed or eliminated in the United States;

    b.    Defendants' prices for generic Glyburide have been raised, fixed, maintained, or stabilized at artificially high and supracompetitive levels; and

c.      Purchasers of generic Glyburide from Defendants have been deprived of the benefit of free and open competition in the market for generic Glyburide.

133.    Plaintiff and members of the Nationwide Class have been and will continue to be injured in their business and property by paying more for generic Glyburide purchased indirectly from Defendants and the co-conspirators than they would have paid and will pay in the absence of the conspiracy.

134.    The alleged contract, combination or conspiracy violates the federal antitrust laws, including the Sherman Act.

135.    Plaintiff and members of the Nationwide Class are entitled to injunctive relief, preventing and restraining Defendants from committing the violations alleged herein.

## SECOND CLAIM FOR RELIEF
### Violation of State Antitrust Statutes
### (on behalf of Plaintiff and the Damages Class)

136.    Plaintiff repeats the allegations set forth above as if fully set forth herein.

137.    During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of generic Glyburide in unreasonable restraint of trade and commerce, in violation of the various state antitrust and consumer protection statutes set forth below.

138.    The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supracompetitive prices for generic Glyburide and to allocate customers for generic Glyburide in the United States.

139.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including: (a)

participating in meetings and conversations among themselves in the United States during which they agreed to price generic Glyburide at specified levels, and otherwise to fix, increase, maintain, or stabilize effective prices paid by Plaintiff and members of the Damages Class with respect to generic Glyburide provided in the United States; and (b) participating in meetings and conversations among themselves in the United States to implement, adhere to, and enforce their unlawful agreements.

140.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, increase, maintain, or stabilize prices of generic Glyburide.

141.    Defendants' knowingly and willfully carried out the anticompetitive acts described above. There was and is no legitimate, non-pretextual, procompetitive business justification for Defendants' contract, conspiracy or combination that outweighs its harmful effects. Accordingly, these acts constitute violations or flagrant violations of the antitrust laws of various states.

142.    Alternatively, during at least the Class Period, there has been a gross disparity between the price that Plaintiff and Damages Class Members paid for generic Glyburide compared to what they would have paid under competitive market conditions, which should and would have been present but for Defendants' unlawful and inequitable conduct.

143.    Said disparity was a direct and proximate result of Defendants' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, from which Plaintiff and Damages Class Members were deprived of the opportunity to purchase competitively priced Glyburide from Defendants and were forced to pay higher prices for generic Glyburide than they otherwise would have paid.

144.    Accordingly, Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of various state antitrust and/or consumer protection statutes.

145.    By engaging the foregoing conduct, Defendants have threatened the business or property of Plaintiff and thus violated the antitrust laws of various states, and/or they have participated in unfair competition or unfair or deceptive acts or practices in violation of state unfair and deceptive trade practices and consumer protection statutes of various states, both of which are listed herein:

a.      Ala. Code §§ 8-10-1 and 6-5-60(a), with respect to purchases in Alabama by Damages Class Members;

b.      Ariz. Rev. Stat. 44-1401, *et seq.*, with respect to purchases in Arizona Damages Class Members;

c.      Cal. Bus. & Prof. Code § 16700 *et seq.*, with respect to purchases in California by Damages Class Members;

d.      D.C. Code § 28-4501 *et seq.*, with respect to purchases in the District of Columbia by Damages Class Members;

e.      Fla. Stat. §§ 501.201, *et seq.*, with respect to purchases in Florida by Damages Class Members;

f.      Haw. Rev. Stat. § 480 *et seq.*, with respect to purchases in Hawaii by Damages Class Members;

g.      Iowa Code § 553 *et seq.*, with respect to purchases in Iowa Damages Class Members;

h.      Kan. Stat. Ann. § 50-101 *et seq.*, with respect to purchases in Kansas by Damages Class Members;

i.      Me. Rev. Stat. Ann. Tit. 10, § 1101 *et seq.*, with respect to purchases in Maine by Damages Class Members;

j.      Mich. Comp. Laws § 445.772 *et seq.*, with respect to purchases in Michigan by Damages Class Members;

k.      Minn. Stat. § 325D.49 *et seq*., with respect to purchases in Minnesota by Damages Class Members;

l.      Miss. Code Ann. § 75-21-1(a) *et seq*., with respect to purchases in Mississippi by Damages Class Members;

m.      Mo. Rev. Stat. § 407.020, *et seq.*, with respect to purchases in Missouri by Damages Class Members;

n.      Neb. Rev. Stat. § 59-801 *et seq.*, with respect to purchases in Nebraska by Damages Class Members;

o.      Nev. Rev. Stat. Ann. § 598A *et seq.*, with respect to purchases in Nevada by Damages Class Members, in that at least thousands of sales of Defendants' PSPs took place in Nevada, purchased by Nevada consumers at supracompetitive prices caused by Defendants' conduct;

p.      N.H. Rev. Stat. Ann. § 356:1 *et seq.*, with respect to purchases in New Hampshire by Damages Class Members;

q.      N.M. Stat. Ann. § 57-1-1 *et seq.*, with respect to purchases in New Mexico by members of the Class;

r.      N.Y. Gen. Bus. Law § 340 *et seq.*, with respect to purchases in New York by Damages Class Members;

s.      N.D. Cent. Code § 51-08.1-01 *et seq.* with respect to purchases in North Dakota by Damages Class Members;

t.      Or. Rev. Stat. § 646.705 *et seq.*, with respect to purchases in Oregon by Damages Class Members;

u.      73 P.S. 201-1, *et seq.*, with respect to purchases in Pennsylvania by Damages Class Members;

v.      R.I. Gen. Laws § 6-36-11(a), with respect to purchases in Rhode Island by Damages Class Members;

w.      S.D. Codified Laws § 37-1 *et seq.*, with respect to purchases in South Dakota by Damages Class Members;

x.      Utah Code Ann. § 76-10-3101 *et seq.*, with respect to purchases in Utah by Damages Class Members who are either Utah residents or Utah citizens;

y.     Vt. Stat. Ann. Tit. 9, § 2453, *et seq.*, with respect to purchases in Vermont by Damages Class Members; and

z.     Wis. Stat. § 133.01 *et seq.*, with respect to purchases in Wisconsin by Damages Class Members, in that the actions alleged herein substantially affected the people of Wisconsin, with at least thousands of consumers in Wisconsin paying substantially higher prices for generic digoxin and/or doxycycline in Wisconsin.

### THIRD CLAIM FOR RELIEF
### Unjust Enrichment
### (on behalf of Plaintiff and the Damages Class)

146.    Plaintiff repeats the allegations set forth above as if fully set forth herein.

147.    To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint.

148.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched. Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on generic Glyburide.

149.    Defendants' financial benefits are traceable to Plaintiff's and Damages Class Members' overpayments for generic Glyburide.

150.    Plaintiff and Damages Class Members have conferred and continue to confer an economic benefit upon Defendants in the nature of profits resulting from the unlawful overcharges described herein, to the economic detriment of Plaintiff and Damages Class Members.

151.    Defendants have benefited from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiff and the members of the Damages Class for generic Glyburide manufactured by Defendants during the Class Period.

152.    It would be futile for Plaintiff and Damages Class Members to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly

purchased generic Glyburide, as those intermediaries are not liable and would not compensate Plaintiff and Damages Class Members for Defendants' unlawful conduct.

153.    The economic benefit Defendants derived from overcharging Plaintiff and Damages Class Members for generic Glyburide is a direct and proximate result of Defendants' unlawful and anticompetitive practices.

154.    The financial benefits Defendants derived are ill-gotten gains that rightfully belong to Plaintiff and Damages Class Members, who paid and continue to pay artificially inflated prices that inured to Defendants' benefit.

155.    It would be inequitable under unjust enrichment principles under the laws of each state in the United States as well as the District of Columbia for Defendants to retain any of the overcharges Plaintiff and Damages Class Members paid for generic Glyburide that were derived from Defendants' unfair, anticompetitive and unlawful methods, acts and trade practices.

156.    Defendants are aware of and appreciate the benefits that Plaintiff and the Damages Class Members have bestowed upon them.

157.    Defendants should be ordered to disgorge all unlawful or inequitable proceeds they received in a common fund for the benefit of Plaintiff and Damages Class Members, who collectively have no adequate remedy at law.

158.    Plaintiff and Damages Class Members are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct, and to the establishment of a constructive trust consisting of such amount, from which Plaintiff and Damages Class Members may make claims on a *pro rata* basis.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the proposed Classes demands judgment that:

A.      The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

B.      That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed: (a) an unreasonable restraint of trade or commerce in violation of Sections 1 and 3 of the Sherman Act; (b) a *per se* violation of Sections 1 and 3 of the Sherman Act; (c) an unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and (d) acts of unjust enrichment by Defendants as set forth herein;

C.      Plaintiff and Damages Class Members recover damages, to the maximum extent allowed under such laws, and that joint and several liability be found to accrue against Defendants in an amount to be trebled to the extent such laws permit;

D.      Plaintiff and Damages Class Members recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

E.      Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged

herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect;

F.     Plaintiff and Damages Class Members be awarded restitution, including disgorgement and restitution of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment, and the creation of a constructive trust to remedy Defendants' unjust enrichment;

G.     Plaintiff and the Class Members be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

H.     Plaintiff and the Class Members recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

I.     Plaintiff and the Class Members have such other and further relief as the case may require and the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues so triable, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

Dated: February 6, 2017                      Respectfully submitted,

**SHEPHERD FINKELMAN MILLER
& SHAH, LLP**

By: */s/Jayne A. Goldstein*
Jayne A. Goldstein
Natalie Finkelman Bennett
35 East State Street
Media, PA 19063
Tel: 610-891-9880
Email: jgoldstein@sfmslaw.com
         nfinkelman@sfmslaw.com

*Attorneys for Plaintiff*